Michael L. Testa
Basile & Testa, P.A.
424 Landis Avenue
Vineland, NJ 08360
Tel: (856) 691-2300
Fax: (856) 691-5655
Email: mtesta@basiletesta.com

**Attorneys for Plaintiff**

**[Additional counsel listed on signature page]**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHEETMETAL WORKERS' NATIONAL PENSION FUND, derivatively on behalf of COMMERCE BANCORP, INC. <br><br> Plaintiff, <br> V. <br><br> VERNON W. HILL, II, JACK R. BERSHAD, JOSEPH E. BUCKELEW, DONALD T. DIFRANCESCO, MORTON N. KERR, STEVEN M. LEWIS, JOHN K. LLOYD, GEORGE E. NORCROSS, III, DANIEL J. RAGONE, WILLIAM A. SCHWARTZ, JR., JOSEPH T. TARQUINI, JR., AND JOSEPH S. VAASSALLUZZO, <br><br> Defendants, <br><br> -and- <br><br> COMMERCE BANCORP, INC., <br><br> Nominal Defendant. | CASE NO: <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Sheetmetal Workers' National Pension Fund ("Plaintiff"), derivatively on behalf of Commerce Bancorp, Inc., ("Commerce" or the "Company"), pursuant to

Rule 23.1, by its undersigned counsel, brings this Verified Complaint upon knowledge as to itself and its own actions, and as to all other matters, upon information and belief based on the investigation made by and through its counsel, against the defendants.

## NATURE OF THE ACTION

1.      Commerce is a publicly-traded bank holding company, headquartered in New Jersey.  Commerce owns and operates two subsidiary banks, Commerce Bank N.A., Philadelphia, Pennsylvania ("Commerce Bank") and Commerce Bank/North Ramsey, New Jersey ("Commerce North").

2.      This is a shareholder's derivative action seeking to recover damages and other relief on behalf of Commerce arising from violations of former and current directors and/or officers' fiduciary duties to Commerce which violations led to two regulatory investigations of Commerce in the past three years.

3.      As detailed herein, these problems arise from a sustained and systematic course of conduct defendants approved of or willfully acquiesced in whereby Commerce made unsafe loans and engaged in questionable related party transactions with its officers and directors.

4.      In 2004, the U.S. Attorney's Office in Philadelphia began an investigation of a "pay-to-play" scandal involving a member of Commerce Bank's board of directors and two of its executive officers, all of whom were indicted for conspiring to commit honest services fraud.  The director died before trial and the two officers were subsequently convicted.

5.      Although the U.S. Attorney closed its criminal investigation in or around November 2006 without taking any action against Commerce itself, upon information

and belief, evidence uncovered in the criminal proceeding led the Office of the Controller

of the Currency (the "OCC") and the Federal Reserve to initiate another investigation

into the safety and soundness of Commerce earlier this year.

6.     Evidence in the criminal proceeding shows that Commerce Bank

executives made questionable loans to third parties as part of the influence peddling

scheme. In doing so, the executives overrode underwriting standards, falsified bank

documents and made loans to persons not qualified to receive them.

7.     Upon information and belief, defendant Vernon W. Hill II ("V. Hill"),

Commerce's Chairman and Chief Executive Officer, who also served at all relevant times

as Commerce Bank's president, has been aware of the inappropriate transactions since at

least the 2002-2003 timeframe. There is evidence, for example, that he was personally

aware of the improprieties in the pay-to-play scandal and in fact authorized several of the

transactions at issue.

8.     In addition, the vast majority of the related party transactions that are

likely being questioned by the OCC involve payments of over $60 million to companies

owned in whole or in part by V. Hill or his wife. V. Hill is at the center of the

controversy. Commerce, however, also engaged in related party transactions with other

Board members as well, as discussed herein.

9.     Commerce's Board is dominated by V. Hill. According to an article

appearing in the *Courier-Post* on January 21, 2007, "[t]he Commerce board has been

compared to an old-boy network for years. All 12 members are male, five are over 70

and almost all are long-time friends of the Hills." Moreover, each defendant knew of,

acquiesced in or ratified the related party transactions at issue.

10.     Thus, this derivative proceeding is necessary to protect Commerce and its shareholders. Commerce's Board has demonstrated an egregious lack of oversight. One or more of its members is personally involved in the wrongdoing at issue and the Board has historically demonstrated its unwillingness to take actions in matters in which V. Hill is involved.

11.     In 2002, for example, after Commerce was criticized for engaging in related party transactions with companies owned by members of the Hill family, V. Hill pledged he would stop making deals with Commerce. Yet, Commerce continued to waste assets and unjustly enrich the Hill family. Just last year, for example, Commerce paid $1.9 million to lease land for 17 New Jersey branches from a company owned by V. Hill and a partner, as well as $7.5 million to a design and management company owned by Hill's wife, Shirley.

12.     Similarly, in the wake of the pay-to-play scandal, Commerce pledged to define and redefine strict guidelines, setting what V. Hill called a "gold standard" for ethical business. Yet, as Robert Hughes of Keefe Bruette & Woods commented to the *Courier Post* after learning of the most recent probe, "[y]ou would think that if the gold standard were in place, the real estate deals would be a nonissue…The fact that this stuff keeps surfacing make investors uncomfortable."

13.     Commerce has suffered and continues to suffer damages caused by V. Hill and other officers' and/or directors' breaches of fiduciary duty. The process of the current investigation, analysts warned, will be long, expensive and painful for Commerce. Indeed, Commerce's plan to aggressively open new branches, with 65 new branches this year alone and 150 in Florida over the next five years, appears to already be

in jeopardy.  V. Hill informed investors in the April 18, 2007 earnings conference call that the OCC literally approved no new branch applications in the first quarter of 2007 and has asked for enhanced information for pending branch site applications, which is lengthening the approval time.

14.     Ralph Cioffi, director of the National Association of Investors Corp., summed up the situation in an interview with the *Courier Post* as follows:  "Commerce has problems, real estate problems and legal problems that aren't going to go away anytime soon."

15.     Although Commerce announced on January 16, 2007 (when the OCC and Federal Reserve probe was announced) that the Board had formed a "Special Litigation Committee" (the "SLC") to "oversee the Company's activities" in connection with the investigation, to date – over three months later – the SLC has filed no claims and no meaningful changes to corporate governance have been reported.

16.     In fact, to the contrary, V. Hill said in the April 18, 2007 earnings conference call that although the Company was evaluating the related party transactions being investigated, at this point "We're making no commitment to change anything right now...."

17.     The SLC is a sham.  It is comprised of interested directors who are reputed to have close ties to the Hill family and, as shown below, whose very conduct is at issue. The SLC, for example, is headed up by defendant Vassalluzzo, a member of Commerce's audit committee in 2006, whose own actions in overseeing and ratifying the related party transactions being investigated are being studied by the regulators.

18.     Moreover, upon information and belief, the OCC and the Federal Reserve are investigating the safety and soundness of the Commerce banks, not just the related party transactions.  Their job is to protect the bank's depositors, not the shareholders.  They step in when they have reason to believe that a bank is being run in an unsound or unsafe manner.

19.     This derivative action is thus necessary to make sure that the interests of the shareholders are being represented appropriately at this important juncture.  Commerce's Board's actions, inaction and conflicts of interest demonstrate that Commerce's Board cannot be trusted to get the job done.

## THE PARTIES

20.     Plaintiff is a resident of the Commonwealth of Virginia and owns and has continuously owned shares of Commerce at all times relevant to this lawsuit.

21.     Nominal Defendant Commerce is a resident of New Jersey, the state in which it is incorporated and headquartered.  Commerce's principal executive offices are located at Commerce Atrium, 1701 Route 70 East, Cherry Hill, New Jersey 08034-5400.

22.     Defendant V. Hill is a citizen of the State of New Jersey and is Chairman and Chief Executive Officer of Commerce.

23.     Defendant Jack R. Bershad is a citizen of the State of New Jersey and a director of Commerce.

24.     Defendant Joseph E. Buckelew is a citizen of the State of New Jersey and a director of Commerce.

25.     Defendant Donald T. DiFrancesco is a citizen of the State of New Jersey and a director of Commerce.

26.    Defendant Morton N. Kerr is a citizen of the State of New Jersey and a director of Commerce.

27.    Defendant Steven M. Lewis is a citizen of the State of New Jersey and a director of Commerce.

28.    Defendant John K. Lloyd is a citizen of the State of New Hampshire and a director of Commerce.

29.    Defendant George E. Norcross, III is a citizen of the State of New Jersey and a director of Commerce.

30.    Defendant Daniel J. Ragone is a citizen of the State of New Jersey and a director of Commerce.

31.    Defendant William A. Schwartz, Jr., is a citizen of the State of New Jersey and a director of Commerce.

32.    Defendant Joseph T. Tarquini, Jr., is a citizen of the State of New Jersey and a director of Commerce.

33.    Defendant Joseph S. Vassalluzzo is a citizen of the State of New Jersey and a director of Commerce.

34.    Defendants V. Hill, Bershad, Buckelew, DiFrancesco, Kerr, Lewis, Lloyd, Norcross, Ragone, Schwartz, Tarquini, and Vassalluzzo will hereinafter collectively be referred to as the "Individual Defendants."

## JURISDICTION AND VENUE

35.    This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a) because this action is an action for, *inter alia,* damages

in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the plaintiff and all of the defendants.

36.     This action is not a collusive one to confer jurisdiction on a Court of the United States which it would not otherwise have.

37.     Venue is proper in this District because Commerce has its corporate headquarters and principal place of business in this District.

## FACTUAL ALLEGATIONS

### Commerce Announces the Close of One and the Commencement of Another Regulatory Investigation

38.     On November 1, 2006, Commerce filed a Form 8-K with the Securities and Exchange Commission (the "SEC") announcing the close of the criminal investigation into its role in the pay-to-play scandal that rocked Philadelphia politics. Specifically, the Company said "In 2004 and 2005, we reported on several inquiries by the U.S. Attorney in Philadelphia with which we have cooperated.  We were recently advised by the U.S. Attorney's office that it has concluded the investigations without any action against us and, as a result, Commerce and its employees are not subjects of any investigations by that office."

39.     Just ten weeks later, however, Commerce and, as the *Courier-Post* described them in its January 21, 2007 article, "its hard-charging officers" are under new government scrutiny.

40.     In a Form 8-K the Company filed on January 16, 2007, Commerce reported that "it has been advised that an investigation is being conducted by the Office of the Comptroller of the Currency, in connection with the Board of Governors of the Federal Reserve System."

**Commerce's Related Party Transactions Are Being Probed**

41.     Commerce revealed in a conference call on January 16, 2007 that the

scope of the investigation "will include but not be limited to transactions with its officers,

directors and related parties, including transactions involving bank premises."

42.     Among the related party transactions surely being examined are extensive

dealings between Commerce and companies owned in whole or in part by defendant V.

Hill or his family.  Examples of recent transactions include the following:

- V. Hill is a partner or in a corporation owned by V. Hill or the Hill Family Trust.  Such group owns properties and has entered into operating leases for land with Commerce Bank for bank premises. The aggregate annual rental under the leases for bank premises with the Hill Family Partnerships was approximately $1.9 million;

- Commerce has engaged in contracts for architectural design and facilities management services with InterArch, a company owned by the spouse of V. Hill.  Commerce has utilized the services of V. Hill's spouse for over 25 years and in 2005, paid $7.5 million to InterArch for those services; and

- V. Hill is a principle equity holder of Galloway National Golf Club and Commerce and/or its subsidiaries utilized the facilities of Galloway National Golf Club at the cost of approximately $482,000.

43.     The transactions that have unjustly enriched the Hill family have been

ongoing for years.  On August 1, 2004, the *New York Times* highlighted some of these

questionable related transactions in an article entitled "*An 'Oops' at the Bank of 'Wow.'*"

The article noted:

- since 2000, Commerce has paid $7 million in rents for leased premises to real estate partnerships in which V. Hill is an investor or partner

- Commerce paid approximately $900,000 in 2002-2003 for the use of Galloway National Golf Club; and

- since the year 2000, Commerce has paid to InterArch, the Company owned by Hill's wife, approximately $26.1 million.

44.     Plaintiff also has reason to believe that the related party transactions being reviewed include loans made to other officers and/or directors as well.  According to the August 1, 2004 *New York Times* article, between 2001 and 2003 Commerce and its subsidiaries engaged in various loans to executives and directors totaling over $340 million.  This is a staggering amount.

45.     As discussed below, at least one of the related party loans was made to Ronald A. White ("White"), a former Commerce Bank director who was indicted in the pay-to-play scandal.  Allegations plaintiff uncovered in the Superseding Indictment filed February 26, 2007 in *United States of America v. Ronald A. White et al*, Crim. No. 04-00370 (E.D.Pa.) shows that Commerce Bank, through its senior officers, made a loan to Mr. White for which he was not qualified and in doing so falsified bank documents.

46.     Other director defendants, as set forth below, benefited from related party transactions as well.

**The New Regulatory Probe Extends Beyond Related Party Transactions**

47.     Although few details of the new probe have been given, it is clear from Commerce's disclosure that more than related party transactions are at issue.  As Commerce itself admitted, the probe includes *but is not limited to* the related party transactions.

48.     Indeed, the fact that the OCC and the Federal Reserve are involved suggests that far more serious matters are at issue.

49.     The OCC, for example, has a special role in regulating banks to ensure that they are being run in a safe and sound manner.

50.     If the OCC believes that a bank or other financial institutions needs special supervision, the OCC will step in.  A problem bank is defined by the OCC as involving one or more of the following deficiencies:

- Ineffective or dishonest management;
- Unwarranted loans to officers, directors, or stockholders;
- An inordinate amount of low-quality assets;
- Insufficient capital;
- Inadequate internal control;
- Inadequate policies and procedures;
- Earnings or liquidity problems;
- Significant medium and long term interest rate risk exposure, and
- Failure of the board or senior management to understand the activities conducted by the bank.

51.     Thus, the fact that the OCC has initiated a probe suggests that the OCC has reason to believe that Commerce's Board is not fulfilling its duties as bank trustees and that Commerce is not being run in a safe and sound manner.

52.     The evidence uncovered in the criminal matter strongly suggests this conclusion.  So too does the timing.  As the *Wall Street Journal* reported on January 17, 2007 in an article entitled *Commerce Bancorp Transactions Under Probe*, regulators typically do not review evidence culled during a federal criminal investigation for possible civil violations until the criminal probe is completed.

### EVIDENCE UNCOVERED IN THE CRIMINAL INVESTIGATION CALLS INTO QUESTION COMMERCE'S SAFETY AND SOUNDNESS

53.     The following allegations, taken largely from the *Superseding Indictment* made public on February 22, 2007, is a description of the type of evidence that regulators likely discovered when reviewing the criminal investigation's findings.

54.     This information shows that Commerce Bank was corrupt at the very top of its organization and that at least defendant V. Hill was personally involved in and/or aware of the wrongdoing.

55.     Moreover, based on the significant business that the pay-to-play scheme generated for Commerce Bank's subsidiary, Commerce Capital Markets ("CCM"), and the fact that Ronald White was a member of Commerce Bank's board from April 2002 through October 2003 when the events at issue occurred, it is reasonable to conclude that the other Commerce Bank board members – which at the time included ten of the twelve Individual Defendants – were aware of or wilfully acquiesced in the wrongdoing being investigated.

### The Pay-to-Play Scandal

56.     Ronald White was a resident of Philadelphia and in 2000-2003 was a private attorney participating in the issuance of bonds by the City of Philadelphia. White had close ties to the Mayor and Treasurer of Philadelphia during this time. *Indictment at ¶ 1,3-4.*

57.     White was paid to provide "consulting services" to Commerce Bank from June, 2000 until October, 2003. His monthly retainer from 2000 to the beginning of 2001 was $10,000 per month and was increased to $15,000 per month in 2001. In or about June 2002, White was made a member of Commerce Bank's Board. These payments were in addition to compensation for serving on the Board. *Indictment at ¶ 6, 64.*

58.     White, however, did not provide consulting services to Commerce Bank. Instead, the payments were made for purposes of gaining influence with the City of Philadelphia financiers. *Indictment at ¶ 6.*

59.     White interacted frequently with two high-ranking executives of
Commerce Bank, Glenn Holck and Steven Umbrell, and occasionally also with defendant
V. Hill in executing the influence peddling scheme.  During the influence peddling
scheme, Glenn Holck was the President of Commerce Bank and Steven Umbrell was a
Regional Vice President. *Indictment at ¶ 1, 6.*

60.     The activities described herein show a complete lack of adherence to
sound banking practices.  Upon information and belief, the practices and policies of
Commerce Bank in connection with the pay-to-play scheme were overlooked by
Commerce's Board with full awareness that they were being done to curry favor and
obtain influence with City of Philadelphia financiers who awarded substantial business to
Commerce Bank's subsidiary, CCM.

61.     Ultimately, Holck and Umbrell engaged in a pattern of activities that
violated both internal and external banking regulations and which legally were felonies.
Holck and Umbrell were indicted with White in 2004 and both were convicted of felony
violations for conspiracy to commit honest services fraud and wire fraud.   White was
also indicted but was never convicted because he died before trial.

*62.*     Holck and Umbrell, as part of their fraudulent scheme, made a series of
questionable loans in 2002 and 2003 in order to gain influence with the City of
Philadelphia's finance team. *Indictment ¶¶ 63–94; 69–229.*  As the government
explained, these loans were "made with the approval of Holck and/or Umbrell "*without
consideration of ordinary underwriting requirements." Indictment at ¶ 65.*

*63.*     For example, in August, 2003, Umbrell insured that the paramour of
Ronald K. White, Janice Rene Knight/RPC Unlimited, was approved for a loan of

$20,385.54. However, any and all underwriting documents associated with this loan were not generated until a week after the loan was approved on or about August 25, 2003. Umbell backdated the underwriting documents, in violation of good banking practices. *Indictment at ¶¶ 66-68.*

64.     In and around March, 2003 Umbrell arranged for an unsecured line of credit for the brother of Ronald White, A.H.  Umbrell misrepresented the purpose of the line of credit of $15,000. *Indictment at ¶ 72.*

65.     In the summer of 2003, Umbrell assisted another White associate, L.R., with a line of credit which was approved without the normal loan documentation and underwriting being performed by Commerce. *Indictment at ¶ 73-77.*

66.     On September 3, 2003, Commerce Bank issued a $150,000 line of credit to L.R. based upon the approval of Umbrell and Holck without formal bank policies or underwriting being followed. *Indictment at ¶ 73-77.*

67.     In late August of 2003, White himself sought to obtain a mortgage on a $1.3 million home he wished to purchase in Naples, Florida.  The request for the mortgage loan was communicated by White to Holck and Umbrell.  Commerce Bank approved this loan without verifying White's assets and liabilities and thus did not discover that White did not have enough cash for the required downpayment, without borrowing it. *Indictment at ¶ 78-94.*

68.     Holck indicated to White that he had spoken with V. Hill, the Chief Executive Officer of Commerce Bancorp, about the mortgage who indicated that with regard to the mortgage, "just do it". *Indictment ¶¶ 79-81.*

69.     In order to obtain the mortgage on the property, White was required to fill out a mortgage commitment letter which was filled out inaccurately and was known to be incorrect by Umbrell and Holck at the time the letter was were signed. *Indictment ¶¶ 84-88.* In addition, to purchase the home, White wrote a check from his bank account at Commerce Bank, though he did not have sufficient funds in the account to cover the check. *Indictment ¶ 82.*

70.     Holck told White that Commerce Bank would have to do an 80% first mortgage and a 10% second mortgage because Holck could not waive PMI [Mortgage Insurance which, upon information and belief is required for loans over 80%] for a director without raising flags. *Indictment ¶ 84.*

71.     Then, White submitted to Commerce a signed mortgage commitment letter falsely representing that White "understood and agreed [he would] not assume any other debt or obligation and correction with the transaction." *Indictment ¶ 85.* In addition to taking out the second mortgage, White borrowed $30,000 to deposit into his Commerce Bank account to cover the deposit check he had already written. *Indictment ¶ 84-86.*

72.     On October 10, 2003, Commerce Bank finalized a first and second mortgage with Ronald White totaling $1,170,000. According to the government, the mortgage was approved by Umbrell, Holck and the Chief Executive Officer of Commerce Bancorp, Inc., V. Hill. *Indictment at ¶ 92.*

73.     Commerce Bank made the loan "without engaging in ordinary underwriting". *Indictment ¶¶ 92-94.*

74.     In and around November of 2002, Corey Kemp, the then treasurer of the City of Philadelphia sought a mortgage from Commerce Bank for the purchase of a home.  Corey Kemp had significant credit problems, numerous delinquencies on credit and loan accounts, an automobile repossession and charged off accounts.  *Indictment ¶¶ 170-172.*

75.     Commerce Bank had rejected Corey Kemp for a $2,000 line of credit on Kemp's poor credit history in September of 2001. *Indictment ¶171.*

76.     On or about December 3, 2002, Umbrell and Holck nonetheless approved an 80% first mortgage for Corey Kemp without undergoing the ordinary underwriting process.  In addition, Umbrell and Holck waived a number of conditions stated in the commitment letter for the mortgage in favor of Kemp.  *Indictment at ¶172.*

77.     On December 18, 2002, Umbrell approved, on behalf of Commerce Bank, a second mortgage in favor of Kemp without undergoing the normal underwriting procedures. *Indictment ¶173.*

78.     Prior to December 18, 2002, Commerce Bank's Consumer Loan Department had evaluated Kemp's request for a first mortgage and the loan officer advised that this was not a loan that the Bank wished to make.  Umbrell overrode the denial and directed the officers to process the loan. *Indictment at ¶174.*

79.     On or about December 24, 2002, Kemp obtained a first and second mortgage totaling $225,489 from Commerce Bank as a result of the approvals by Commerce executives Holck and Umbrell, who did not follow ordinary underwriting guidelines.  The loans were not reasonable and customary extensions of credit. *Indictment ¶176.*

80.     In addition to the mortgage, Umbrell and Holck approved, in March 2003, a refinance of an existing car loan for Kemp, even though the request was rejected by the Consumer Loan Underwriting Department at Commerce Bank. *Indictment ¶ 177.*

81.     In May and June of 2003, Umbrell approved a $480,000 construction loan for the church where Corey Kemp served as a trustee. The loan approval did not undergo the ordinary underwriting policies of Commerce Bank, provided favorable terms as it related to expenses associated with the construction and included a waiver of the $3,500 appraisal fee. These were not customary loan terms. *Indictment ¶ 179.* Indeed, an employee of Commerce Bank noted in the loan file that "I did what I was told to do." *Indictment ¶ 179.*

82.     In and around July 1, 2003, Commerce Bank executive Umbrell again provided favorable loan terms to Corey Kemp and his affiliates for the sole purpose of gaining influence with the City of Philadelphia financiers. Corey Kemp had requested a loan on behalf of his brother-in-law who was unable to obtain a loan at other banks and who had "shaky credit". *Indictment at ¶ 181.*

83.     On July 7, 2003, Umbrell approved an unsecured loan of $7,500 to Kemp's brother-in-law. Again the Commerce Bank Underwriting Department had declined to extend this credit, but Umbrell overrode the denial without explanation. The grant of this loan was not in conformance with Bank policies. *Indictment ¶¶ 181-183.*

84.     In and around May of 2003, the City of Philadelphia was seeking proposals for banks interested in offering a $30 million line of credit for the Neighborhood Transformation Initiative (hereinafter "NTI") in Philadelphia. Corey

Kemp and Ronald White, with Holck and Umbrell, schemed to insure that Commerce Bank was awarded the line of credit. *Indictment ¶¶ 187-189.*

85.    As part of the process for the NTI line of credit, Commerce Bank, along with others, was required to submit a proposal.  The initial proposal submitted by Commerce Bank on May 27, 2003 indicated they would establish the line of credit at a price of London InterBank Offered Rate plus 100 basis points. *Indictment at ¶ 190.*

86.    Kemp and White informed Holck and Umbrell that their bid proposal was the first submitted on the NTI line of credit and that in the future, Commerce should submit its bid proposal after all others, so the group could insure the Commerce proposal was more favorable than prior submissions before Commerce submitted its proposal. *Indictment ¶ 191.*

87.    Despite the bidding process, Kemp allowed Commerce to submit a revised bid.  White and Kemp informed Umbrell and Holck that with regard to the NTI line of credit, the basis points would need to be reduced if Commerce Bank wanted the business to undercut a more favorable bid by another bank. *Indictment at ¶ 195-199.*

88.    Holck informed White and Kemp that V. Hill had required the 100 basis points and that if a reduction was necessary, either White or Kemp would need to speak to defendant V. Hill about it and get his permission to submit the revised bid. *Indictment ¶¶ 195-199.*

89.    Between June 2-3, 2003, White contacted V. Hill who explained the need to reduce further the basis points in order to secure the NTI contract and got V. Hill's agreement to do so. *Indictment at ¶ 198-202.*

90.     On June 11, 2003, Commerce Bank was awarded the NTI line of credit. *Indictment at ¶206-209.*

91.     On February 25, 2003, White contacted V. Hill and indicated that the City would be depositing $50 million with the Bank. *Indictment ¶218.*

92.     On February 27, 2003, White informed Umbrell that the City intended to deposit $50 million in Commerce Bank. White further informed Umbrell that he had overdrawn his personal accounts by approximately $15,000.  Umbrell agreed to cover the shortfall prior to the time when the City was to deposit the $50 million with Commerce Bank. At the same time the construction loan for Kemp's church was closing.  Kemp approached Umbrell and asked Umbrell to waive the $3,500 appraisal fee, and did so. *Indictment ¶¶219-221.*

93.     Three days later on June 27, 2003, Kemp informed Umbrell that the City would deposit all $50 million in Commerce Bank. *Indictment at ¶224.*

94.     CCM, between 2000 and 2003, through the help and advocacy of Ronald White, was able to participate in various City of Philadelphia bond transactions. *Indictment ¶225.*

95.     As a result of White's efforts, in August of 2003, CCM was also assured that it would be part of the Philadelphia Municipal Authority bond issuance. *Indictment ¶229.*

96.     Of 40 investment banks used by the City of Philadelphia in bond deals during the three fiscal years beginning in July 1, 2000, CCM earned more in fees than all but two. *Indictment at ¶64.*

## The Related Party Transactions and Pay to Play Scandal Strongly Suggest that Commerce's Safety and Soundness, and the Individual Defendants' Lack of Oversight, Are In Question

97.     Commerce has lost considerable goodwill as a result of the pay-to-play scandal.

98.     It also has come under scrutiny several times over the past five years for its extensive related party transactions.  Although Commerce claims that all of its related party transactions were done at fair market value, the fact that they are under scrutiny by the OCC suggests the opposite.  As Robert  Hughes of Keefe Brunette and Woods said after the OCC probe was announced, if the gold standard that V. Hill promised years ago were truly in place, the related party transactions should not now be at issue.  Other analysts expressed similar sentiments, saying that the re-emergence of issues that were widely believed to have been resolved is unsettling, because it suggests that regulators have uncovered new problems.

99.     Notwithstanding the accusations confronting Commerce over the years, the Individual Defendants continued to engage in, acquiesce and/or approve the related party transactions and looked the other way with regard to the corruption infecting Commerce Bank arising from the pay-to-play scandal.

100.    In 2002, for example, the Record reported that Commerce said it would reexamine its long time business relationship with Shirley Hill, whose design company is paid millions every year for designing and furnishing Commerce bank branches.   Yet, last year, Mrs. Hill's company earned $7.5 million for design services.

101.    Similarly, V. Hill's real estate company earned $1.9 million last year alone in related party leases.  As analyst Wilson Smith of Boenning & Scattergood in Pennsylvania said, leasing land from a bank founder and top officer is "pretty unique."

102.    This is especially true because V. Hill, according to Bloomberg, reportedly agreed in 2002 not to participate in any future real estate transactions with the Company or its subsidiaries.  Apparently at the time V. Hill said that, he had already entered into leases that are renewable until 2048 when V. Hill would turn 103 years old. V. Hill's promise rings hollow.

103.    At a minimum, the OCC investigation calls into serious question this Board's ability to oversee Commerce banks' operations and discharge their fiduciary duties in a manner to ensure the safe and sound operation of the banks.

104.    In order to ensure that banks are operated in a safe and sound manner, the OCC has set forth guidelines and obligations for banking directors in an effort to help bank directors fulfill their duties in a prudent manner.

105.    The OCC published a booklet entitled *The Role of a National Bank Director, The Director's Book.*  Set forth below are descriptions of duties of a national bank director discussed in the OCC booklet.  For example, the OCC provides that members of a bank board of directors should have the following characteristics, among others:

- Basic knowledge of the banking industry, the financial regulatory system and the laws and regulations that govern the operation of the institutions;
- A willingness to avoid conflict of interest;
- Background, knowledge and experience in business or other discipline to oversee the bank, and
- A willingness and ability to commit the time necessary to prepare for and regularly attend board and committee meetings.

106.     In order to effectively manage bank risk, Commerce's Board is responsible for identifying and endorsing the Bank's risk tolerance and approving polices that set standards for the nature and level of risk the Bank is willing to assume.

107.     The Board has a duty to insure that controls, policies and procedures are put into place that allows it to: measure bank risks, control bank risks and monitor bank risks.  These risks would include and are not limited to conflict of interest, and adherence to sound banking principles.

108.     The Board has a duty to insure that its guidance, policies and procedures as it relates to risks are being adhered to throughout the Bank and that monitoring systems are in place that allows it to supervise the risks.

109.     It is the duty of the Board to insure any deficiency in one or more of these policies and/or controls are corrected.

110.     The Board has a fiduciary duty to insure and maintain an appropriate relationship with subsidiary companies and banks.

111.     The Board of Directors is responsible for understanding and insuring that management at subsidiary banks is in compliance with banking laws, regulations and does not expose the parent company to unreasonable risk.

112.     The Board has a fiduciary duty to monitor operations of the Bank and its subsidiaries to insure the effective and legal daily banking operations.  This would include ensuring a sound system of internal controls into the bank's daily operating procedures designed to safeguard assets, ensure the accuracy and reliability of data, ensure compliance with policies and laws and regulations which should include precautions to insure proper separation of duties and responsibilities of management.

113.    The Board has a duty to insure that the bank and its subsidiaries does not employ relaxed standards or terms on loans to insiders and affiliates.  Banking laws and regulations prohibit banks from providing preferential treatment to insiders and affiliates.

114.    The Board has a fiduciary duty to insure public confidence in a bank's operation and should insure no insider abuse.  The Board of Directors can reduce insider abuse with clear written policies related to insiders and their related interests.

115.    The Board of Directors has a duty to insure an insider policy that addressed:

- Guidelines for insider lending and transaction with bank affiliates;
- The disclosure of actual and potential conflicts;
- Guidelines for handling confidential information;
- The need for dealings to be at arms-length;
- Prohibitions against the use of insider information and securities transactions;
- Restrictions on the acceptance of gifts, bequeaths or other items of value from customers or other persons having a business relationship with the bank.

116.    The Board has a fiduciary duty to insure that any and all actions with related parties and/or insiders follow and adhere to a policy that should include the following:

- A written insider policy;
- Consulting with a bank or personal legal counsel before entering into or approving transactions involving the bank and a director or a company controlled by the director;
- Disclosing all real or potential conflicts to the entire board before a board decision is made;
- Making sure that such transaction between the bank and a director or a company controlled by the director are documented fully to include independent appraisals of property that the bank is considering buying,

leasing or selling from or to a director, or other documents establishing the competitiveness of the terms;

- Information that a proposed loan to a director and/or his/her business interest is comparable with specified loans made by the bank to non-insiders;
- Board minutes that reflect the nature of the board's deliberations regarding a potential conflict of interest involving a director, and
- Board actions approving such transactions as required.

117.    The federal laws on insider transactions prohibit the bank from making loans to insiders on more favorable terms than loans provided to other customers.  Other prohibitions include:

- Making a loan to an insider without applying the bank's normal credit underwriting procedures;
- Making an insider loan when the loan carries a greater than normal risk of repayment, and
- Failing to require the same type and amount of collateral that the bank requires of borrowers who are not insiders or bank employees.

118.    In addition, the Board of Directors has a fiduciary duty to insure that the Bank's operations are in compliance with all banking laws and regulations, including those laws on insider transactions; 12 U.S.C. §§ 375, 375A, 375B.

119.    The Board of Directors has a duty to insure that the bank has and follows safe and sound banking practices, 12 C.F.R. § 30, which include operational and managerial standards including but not limited to loan documentation and credit underwriting.

120.    The Board of Directors has a duty to comply with laws that expose Directors to criminal liability; 18 U.S.C. §§ 215, 656, 1005, 1344, which may expose the Director for criminal liability for any of the following:

- Falsifying bank records;
- Misuse or misapplying bank funds or assets;

24

- Request or accept fees or gifts to influence, or as a reward for, bank business;
- Making false statements generally.

121.   The Individual Defendants' involvement in the transactions at issue and their potential vulnerability therefore in the current investigation, cannot be understated.

122.   The Board individually and as a group violated their duty to:

- Oversee, monitor and supervise bank activities by allowing insider transactions to occur without proper documentation;
- Allowing affiliates and Directors to obtain loans and other favorably bank treatment;
- Allowing bank employees and executives to accept gifts or make demands in return for favorable bank business.

123.   The Board also has a fiduciary duty of loyalty to the Bank. The duty of loyalty prohibits a Director from placing his or her personal or business interests or those of other above the Bank's corporate interest. A Director must be fair in all dealings with the Bank and personal interests must no affect his or her decisions as a director.

124.   As discussed below, Commerce's Board is incapable of discharging its duty of loyalty in connection with the matters being probed. The Board is not disinterested and is not independent. As the *Courier Post* described in an article discussing the most recent probe, Commerce's Board is a "good old boy network" comprised of twelve men, most of whom are close friend with the Hill family. In addition, the Board's very own actions and inactions are at issue as a result of the members' (1) awareness and approval of the related party transactions being investigated; (2) acquiescence in and, for V. Hill at least, personal involvement with Ronald A. White's pay-to-play scheme; (3) failure to fulfill their own fiduciary duties as bank trustees to ensure that the Commerce banks are operated in a safe and sound manner.

## THE CURRENT BOARD OF DIRECTORS IS SUBJECT TO THE FOLLOWING CONFLICTS WHICH MAKE THEM NEITHER DISINTERESTED NOR INDEPENDENT:

125.    In order to bring an action for the breach of fiduciary duties alleged, the current members of the Board of Directors would be required to sue themselves and/or their fellow directors of Commerce, with whom they are good friends, and with whom they have entangled financial alliances, interest and dependencies.  The Board of Directors would not be able to vigorously pursue such an action because the Board is not independent.

126.    The Board is currently comprised of twelve members.  For the Board to be independent, a majority of the Board, or seven or more directors, must be independent.

127.    Of the Board's twelve members, Commerce itself has conceded in its most recent proxy statement that four of them, Hill, Buckelew, Lewis and Norcross, are not independent.  See page 10 of Commerce's Form DEF 14A 1, filed with the SEC on April 12, 2007.

128.    Only eight directors are left.  As shown below, Commerce does not have seven or more independent directors.

129.    Defendant Schwartz, for example, is manifestly not independent.  He has been a member of Commerce's and Commerce Bank's Boards since 1997 and thus was on the Boards during the pay-to-pay scandal.  Schwartz's lack of oversight is thus likely the subject of the currently regulatory probe.  Schwartz is also the founder and Chief Executive Officer of U.S. Vision.  Commerce helped Schwartz sell U.S. Vision for $32.5 million, and defendant Norcross, who serves as Chairman and CEO of Commerce Bank Insurance Services and whom Commerce admits is not disinterested, was a major shareholder of U.S. Vision.  That Commerce does not really consider Schwartz

independent is evidenced by the fact that Schwartz, despite years of service on Commerce's Board, has never served on a Board committee. There are only two board members who have not served on a Board committee besides the four directors who are officers of Commerce subsidiaries and whom Commerce concedes, by necessity, are not independent.

130.    Defendant Bershad is also not disinterested or independent. From 2002-2006, Mr. Bershad served on the Compensation Committee, which established salaries, bonuses and stock option awards for all of Commerce's executive officers including V. Hill, and on the Nominating and Governance committee. In addition Bershad has been a member of Commerce's and Commerce Bank's board since 1987. As a member of the committees noted above and of the board of Commerce Bank, Mr. Bershad was or should have been aware of Ronald White's role in the pay-to-play scandal and the compensation paid to him for fictitious services. Bershad's knowledge of the wrongdoing and/or lack of oversight is thus likely a matter being investigated by the OCC. Bershad is also directly interested because he derives personal profit from business transactions with Commerce. Bershad is an attorney and Chairman Emeritus of the Law Firm of Blank, Rome LLP which provides legal services to Commerce and profits from its relationship with Commerce. Thus, Bershad is involved in some of the very related party transactions with Commerce that the OCC is likely looking at.

131.    Defendant DiFrancesco is not disinterested or independent. DiFrancesco is also a long time friend of the Hill Family and of defendant Norcross, who is reportedly a powerbroker in the New Jersey Democratic party. DiFrancesco is the former governor of New Jersey and has enjoyed the political support of Norcross over the years.

DiFrancesco has been on the Commerce and Commerce Bank Boards since 2002, around the same time that Ronald White became a member of Commerce Bank's Board. Thus, his knowledge and lack of oversight in connection with the pay-to-play scandal are likely the subject of the ongoing probe. In addition, DiFrancesco derives personal profit from his business transactions with Commerce. DiFrancesco is an attorney and partner of DiFrancesco, Bateman, Cooley, Yospin, Kunzman, Davis & Lehrer, P.C. which provides legal services for Commerce. Thus, DiFrancesco is involved in the very related party transactions that the OCC is likely looking at.

132.    Defendant Kerr is neither disinterested nor independent. He has been a member of Commerce Bank's Board since 1973, when it was formed, and of Commerce's Board since 1982. His involvement and/or lack of oversight with the pay-to-play scandal are thus directly implicated. Kerr also is chairperson of Markeim-Chalmers which provides real estate services and appraisals for Commerce. Accordingly, Kerr is personally involved in some of the related party transactions that the OCC is likely investigating.

133.    Defendant Ragone is directly interested because he was a member of the audit committee during the relative period and directly participated in the wrongs alleged. Ragone would not institute a suit against his fellow directors also because it would bring scrutiny to his own stock sales from 2002 to the present. Ragone is also interested because he served on the Audit and the Oversight Committees from 2002-2006 and knew or recklessly disregarded that the supervisory and monitoring controls for the Company were inadequate and that there were no internal controls that would stop the misconduct from taking place.

134.     Defendant Tarquini lacks the requisite independence as well.  Tarquini, a long time friend of V. Hill, has served on Commerce Bank's Board since its inception in 1973 and, like V. Hill, on Bancorp's Board since its inception in 1982.  Tarquini has served on the Audit and the Oversight Committees from 2002 to 2006, like Ragone.  Thus, Tarquini's own actions and inactions are likely the subject of the OCC investigation.

135.     Defendant Vassalluzzo was a member of the Audit Committee in 2006.  As such, he approved related party transactions being investigated.  His conduct is therefore in issue, defeating his independence as well.

## DEMAND ON THE BOARD WOULD BE FUTILE

136.     The long-standing relationships between V. Hill and the Board, as well as the long history of the Board's acquiescence to and, in many cases, involvement in self-dealings and transactions with related parties make clear that any demand upon the Board to cease and desist from these activities would be futile.  There is no reason to believe that the current Board would seek to initiate suit against V. Hill or any of the other directors who were direct beneficiaries of improper related party transactions or that the Board would seek to recover wasted assets of Commerce and/or ill gotten profits.

137.     Plaintiff has not made any demand on the Company's current Board of Directors to institute this action, as such demand would be futile.  The Individual Defendants each should have been acutely aware of the violations of internal policies, both with regard to the related party transactions and the pay-to-play corruption scheme, and there is a substantial likelihood of liability for their numerous violations of fiduciary duty as a result.

138. These breaches of fiduciary duty do not just stem from a disagreeable business decision. To the contrary, the wrongdoing and harm alleged in this complaint flows directly from the Individual Defendants' deliberate and conscious decision to permit the sustained and systemic deficiencies that plagued internal controls with compliance.

139. Given this heightened knowledge and understanding on the part of the Individual Defendants, their wrongful conduct exceeds mere inattention. The Individual Defendants took almost no steps to implement any type of internal controls to assure satisfaction of their compliance obligations – in fact, these defendants remained willfully ignorant of defects by even failing to implement adequate information systems to alert them of those dangerous activities. Such conduct is nothing less than a complete, knowing and intentional abdication of their fiduciary duties to the Company and its shareholders.

140. Another factor militating toward a finding that the Individual Defendants face a substantial likelihood of liability is that the compliance issues and resultant problems were not just confined to a single event. Rather, as detailed above, the instances of fraud and malfeasance that resulted from years of fraudulent activities and lack of internal controls was rampant.

141. As a result of the above, the Plaintiff believes no demand to the current Directors will be effective and has not made such demand because of this futility.

## COUNT I

## BREACH OF FIDUCIARY DUTIES

142.    Plaintiff incorporates and realleges paragraphs 1 through 141 as if set forth fully herein.

143.    The Defendants, as members of Commerce's Board, had fiduciary duties to the shareholders and to the Company to insure that all transactions with related parties were entered in good faith, negotiated at arms length, providing benefit to the company and shareholders at fair market value and would not jeopardize future financial performance of the Bank.

144.    In addition, Defendants had fiduciary duties to Commerce and its shareholders to insure that the management and operation of Commerce banks complied with all laws regulations and did not expose the shareholders or customers of the banks to unreasonable risks.

145.    The Defendants as members of the Board of Directors had a fiduciary duty to the shareholders and Commerce to insure that effective management controls and supervision is in place to insure the efficient and profitable operation of the banks.

146.    Defendants had a duty of loyalty to Commerce and to make full and complete disclosure if their actions are not in accord with these duties.

147.    Defendant V. Hill controlled the Board in such a way and manner as to insure that all related party transactions between Commerce and the V. Hill related parties were approved without investigation.   This culture, upon information and belief, also fostered extensive related party transactions between Commerce and entities related with other Individual Defendants as well.

148.    Defendant V. Hill has personally benefited financially from the approval of the related transactions by the Commerce Board.

149.    As a direct and proximate result of the knowing, reckless and/or intentional breach of fiduciary duties, Commerce has sustained serious irreparable injury for which relief is sought herein.

## COUNT II

### UNJUST ENRICHMENT

150.    Plaintiff incorporates and realleges 1 through 149 as if set forth fully herein.

151.    Defendant V. Hill and others, upon information and belief, have benefited financially, directly and indirectly, and have been unjustly enriched at the expense of Commerce and its shareholders as a result of the self-dealings and related party transactions conducted throughout the years with Commerce which, upon information and belief, are being investigated by regulators.

152.    These Defendants' unjust enrichment and direct and indirect financial gains as a result of his self-dealing with Commerce have caused the Plaintiff and Commerce damages which Plaintiff cannot calculate.

### PRAYER FOR RELIEF

**Wherefore,** Plaintiff demands judgment against the defendants as follows:

A.      A finding that the defendants have violated their fiduciary duties to Commerce and its shareholders and have wasted Commerce's assets;

B.      An Order requiring the Company to comply with applicable rules and regulators regarding management oversight procedures and/or controls;

C.      An Order requiring each Defendant who profited from related party transactions to account for any and all ill-gotten profits and unjust enrichment;

D.   A finding against defendants for an amount of damages sustained by Commerce as a result of defendants' breaches of fiduciary duties in an amount to be determined by a jury with prejudgment interest; and

E.   An Order granting all such other and further relief as this Court may deem just and proper.

May 11, 2007.                              Respectfully submitted,

Michael L. Testa, Esq.
New Jersey Bar No. ___
Basile & Testa, P.A.
424 Landis Avenue
Vineland, NJ 08360
Tel:  (856) 691-2300
Fax: (856) 691-5655
Email: mtesta@basiletesta.com

Ann Kimmel Ritter, Esq.
South Carolina Bar No. 8480
Motley Rice LLC
One Georgia Center
28 Bridgeside Boulevard
Mt. Pleasant, SC  29465
Direct Dial: (843) 216-9166
Facsimile:  (843) 216-9450
Email: aritter@motleyrice.com

Seth D. Rigrodsky, Esq.
Rigrodsky & Long, P.A.
919 North Market Street, Suite 980
Wilmington, DE  19801
Direct Dial:  (302) 295-5305
Facsimile:  (302) 654-7530
E-mail:  sdr@rigrodskylong.com